FILED

03/17/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0131

DA 25-0131

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 54

STATE OF MONTANA,

> Plaintiff and Appellant,

v.

ANDREW EMMINGS,

> Defendant and Appellee.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-17-715
Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Austin Knudsen, Montana Attorney General, Selene Koepke, Assistant
Attorney General, Helena, Montana

Matthew Jennings, Missoula County Attorney, Missoula, Montana

For Appellee:

Tammy A. Hinderman, Appellate Defender Division Administrator,
Emma N. Sauve, Assistant Appellate Defender Helena, Montana

Submitted on Briefs: September 24, 2025

Decided: March 17, 2026

Filed:

_____
Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1 The State of Montana appeals from a January 29, 2025 order of the Fourth Judicial District Court. The District Court dismissed the State's petition to revoke Andrew Emmings' suspended sentence and struck the order of the prior District Court Judge which had revoked Emmings' conditional discharge from supervision. We reverse and remand.

¶2 We restate the issues on appeal as follows:

*Issue One: Did the District Court violate the law of the case when it struck a previous order of a different judge on the same case, after Emmings failed to appeal the previous order?*

*Issue Two: Did the District Court err in holding an individual on conditional discharge from supervision may terminate the remaining time on his sentence by moving out of state pursuant to § 46-23-1020, MCA?*

*Issue Three: Did the District Court abuse its discretion when it held the previous judge banished Emmings from the State of Montana and imposed impossible conditions of supervision?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On May 15, 2017, the Missoula County Justice Court issued a temporary order of protection (TOP) to an adult female petitioner and against Andrew Emmings. Later, on June 1, 2017, there was a hearing on the TOP, after which the court granted a permanent order of protection (OOP) against Emmings. Between June 5 and June 7, 2017, the protected party reported Emmings had already violated the OOP multiple times.

¶4 On June 8, 2017, Detective Garret Van Hoose with the Missoula County Sheriff's Office spoke with Emmings over the phone. During that call, Detective Van Hoose ensured Emmings was aware of the OOP and its terms, and he reminded Emmings not to

2

contact the protected party. However, Emmings continued to contact the protected party up to 21 additional times. The State then charged Emmings with 21 counts of violating the OOP under § 45-5-626(3), MCA.

¶5 On May 1, 2019, pursuant to a plea agreement, Emmings plead guilty to 8 of the 21 counts of violation of the OOP. While the criminal case against him was pending, Emmings' release was revoked twice. It was revoked once for a felony offense of criminal endangerment in violation of § 45-5-207, MCA, for driving erratically and nearly causing a collision, and another time for failing to comply with a presentence investigation. Emmings left the state without completing the presentence investigation interview.

¶6 Before sentencing, Emmings' attorney, Ben Darrow, requested to withdraw as counsel, stating "the relationship between Defendant and counsel has deteriorated." Shortly thereafter, Emmings was charged with disorderly conduct after going to Darrow's office and engaging in threatening behaviors. Other than his attorney and the female protected party, who already had an OOP against him, Emmings likewise seemed to develop a feeling of antipathy towards two other individuals, Dillon Kato and David Glaser.

¶7 Kato was a local newspaper reporter for the *Missoulian* who had written several articles related to Emmings' criminal cases. Seemingly in response to Katos' articles about him, Emmings went to the *Missoulian* office up to three separate times where he demanded the newspaper take down the articles and made lewd gestures to *Missoulian* staff. Similarly, Emmings called Kato's current employer, a law firm, several times seeking legal counsel to sue Kato and requesting to speak with him. Emmings also made multiple social

3

media posts and messages about Kato, culminating in emails Emmings sent to his own parents threatening to kill Kato if they did not lend him money.

¶8 Glaser is the president of a non-bank lending company in Missoula who had denied Emmings a loan in 2016. Emmings made a multitude of posts on social media referencing Glaser, calling him names, and threatening him. Additionally, Glaser alleged Emmings had called him several times in 2016 and 2019 threatening to kill him and informing his assistant to tell Glaser, "I'm coming for you."

¶9 On July 24, 2019, the District Court sentenced Emmings to a net sentence of 12 years to the Department of Corrections (DOC), with 10 years suspended. There were multiple conditions on Emmings' sentence, including:

> **Defendant shall not use social media except for business purposes.** The Probation Officer is required to monitor the social media to ensure it is used only for business. <u>The Court ordered the Defendant to find a counselor to help him address social media and other communications to avoid threatening and inappropriate communications.</u>

(Emphasis in original.)

¶10 Emmings served his custodial sentence and was released on probation in July 2021. On April 5, 2022, Emming filed a petition for conditional discharge from supervision pursuant to § 46-23-1011(6)(a)(i), MCA, which the District Court denied. Emmings later filed a second petition for conditional discharge on August 1, 2022. This time, the District Court granted the petition on August 23, 2022, and clarified "as specified by Mont. Code Ann. § 46-23-1011(10), this discharge is only conditional. The Court may reimpose the supervision requirement if necessary and appropriate." However, the District Court did not specify the conditions of Emmings' discharge. Emmings then moved to California.

4

**Revocation of Conditional Discharge**

¶11    While in California, Emmings sent an email to his parents containing multiple threats to Kato's life.  Emmings' parents forwarded the emails to his former probation officer, who then alerted the State.  The State then petitioned the District Court to revoke Emmings' conditional discharge and the District Court immediately granted the petition.  When Emmings' probation officer informed him he needed to return to Missoula, Emmings refused and told the officer he "would block [her] number, and would continue to post on Facebook."

¶12    On February 15, 2023, the District Court held a status conference on this case.  Emmings appeared remotely by video and requested the court to stay the revocation order for additional briefing and a hearing on the issue.  The District Court agreed to do so on the condition that Emmings refrain from posting about or contacting Kato, Darrow, or Matt Jennings, the Missoula County Attorney.

¶13    On June 8, 2023, the District Court heard oral argument on the revocation issue.  On June 27, the State filed notice that Emmings sent additional threatening messages to Glaser, including a message to Glaser's LinkedIn account stating:

> Hi Dave
>
> Remember when you told Judge Halligan I was going to kill you?
>
> I do.
>
> Remember when you denied my $20,000 business loan because I'm Jewish and I have Asperger's?
>
> I'm a multi-millionaire. I never needed the loan.  It was just a test to see if you would deny it.

5

I'll see you in court soon.

The multiple threatening messages resulted in Glaser obtaining a TOP against Emmings.

¶14    Shortly thereafter, on July 6, 2023, the District Court ordered Emmings' conditional discharge be revoked, placing him back on probation pursuant to § 46-23-1020(2), MCA, subject to an evidentiary hearing.  Emmings argued his conditional discharge could not be revoked under § 46-23-1020(2)(a) or (b), MCA, because he was not charged with a crime, nor does § 46-23-1020(2)(c), MCA, apply because the District Court did not set any specific conditions in its August 23, 2022 order setting conditional discharge.  While the District Court agreed the meaning of § 46-23-1020(2)(c), MCA, is facially ambiguous, it ultimately concluded "that 'any condition' in [§ 46-23-1020](2)(c), MCA] means any condition set by the Court in the original sentence or in the order discharging supervision, as long as those conditions were within the original sentence."

¶15    On August 25, 2023, the District Court held an evidentiary hearing to determine whether Emmings should be placed back on probation.  The court found Emmings violated the original conditions of the amended judgment.  The court then revoked Emmings' conditional discharge from supervision and required him to contact the probation office to determine his supervision requirements but allowed him to remain in California.  The court also reimposed all prior conditions, "other than those that would directly require him to be in the State of Montana."  Emmings did not appeal from this order and did not appeal Judge Halligan's denial of his motion to dismiss the petition on the grounds he had not violated the conditional discharge order.

6

¶16   On October 26, 2023, Probation Officer Jeremy Lizotte filed a report of violation (ROV), alleging Emmings had absconded. The ROV noted Emmings failed to report his residence, proof of income, or employment. Furthermore, Lizotte made several attempts to contact Emmings without a response. Specifically, Lizotte attempted to contact Emmings on August 29, September 14, and October 12, 2023. Emmings did not respond until he replied to the October 12 email, where he stated:

> Yeah, I've decided that I'm not going to be put back on probation for exercising free speech. I have committed no crimes and the condition I allegedly "violated" was free speech. No Judge has the right to tell me what I can/cannot say. Congress dies [sic] not allow Judges to make[] orders that violate the 1st amendment. I have committed no crimes. And furthermore, in a effort to get richer than I am, I'm not going to let anyone who makes less money then [sic] me, or is worth less money than me, tell me what to do. Especially not somebody who gets paid by the hour. And further, the Judge ordered me to stay in California. Goodbye[.]

Lizotte was also able to contact Emmings by phone on October 26, 2023, to ask whether Emmings "was still not willing to be on probation." During the conversation, Emmings' responses were rife with expletives and insults against Lizotte.

¶17   On December 18, 2023, the State filed a petition to revoke Emmings' suspended sentence. After the State filed the petition, Judge Halligan recused herself[1] and invited Judge John Larson to assume jurisdiction. Judge Larson assumed jurisdiction and issued a $250,000 bench warrant for Emmings' arrest.

¶18   Emmings filed a motion to dismiss the revocation, and the State filed a brief opposing the motion. On January 29, 2025, Judge Larson dismissed the petition to revoke

---

[1] During the last hearing of his prior revocation, Emmings had informed Judge Halligan he had filed a federal lawsuit against her.

and struck the order reimposing his probationary supervision on two different grounds. Judge Larson first reasoned, pursuant to § 46-23-1020, MCA, "[s]ince he [Emmings] became a resident of California his sentence would then be discharged and not subject to revocation." He further ruled,

> [t]he Court Order on reimposition of probationary sentence . . . put conditions in place that were unquestionably illegal, contradictory, and made it impossible for Mr. Emmings to be able to stay in compliance with probation. Specifically, [because] the Court ordered that he [Emmings] was to remain outside the State of Montana, de facto banishing him.
>
> .   .   .
>
> [And] [t]he Court ordered contradictory conditions be imposed which made it impossible for Mr. Emmings to be compliant with probation, since he did not live in Montana.

The State appeals the District Court's striking of the order reimposing Emmings' supervision and dismissal of the petition to revoke.

## STANDARD OF REVIEW

¶19    "This Court reviews de novo, for correctness, a district court's decision on a motion to dismiss a criminal case." *State v. Madsen*, 2013 MT 281, ¶ 6, 372 Mont. 102, 317 P.3d 806. Issues involving statutory interpretation and construction are questions this Court reviews for correctness. *Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶ 18, 384 Mont. 503, 380 P.3d 771. This Court reviews a district court's application of the law of the case doctrine for abuse of discretion. *State v. Keefe*, 2022 MT 121, ¶ 13, 409 Mont. 86, 512 P.3d 741. A court abuses its discretion when it "acts arbitrarily without conscientious judgment or exceeds the bounds of reason." *State v. McLaughlin*, 2009 MT 211, ¶ 9, 351 Mont. 282, 210 P.3d 694.

8

## DISCUSSION

¶20    *Issue One: Did the District Court violate the law of the case when it struck a previous order of a different judge on the same case, after Emmings failed to appeal the previous order?*

¶21    The State contends the District Court failed to apply the law of the case doctrine, improperly dismissed the petition to revoke Emming's conditional discharge, and improperly struck Judge Halligan's order reimposing his probationary supervision. Emmings responds, "the law of the case doctrine does not prevent a district court from changing its mind or correcting a previous action."  In support of his claim, Emmings argues "only that when this Court . . . makes a ruling on an appeal of a case, and that case is remanded for further proceedings, this Court's ruling is the law of that case . . . ." Emmings misconstrues our law of the case precedent.

¶22    The law of the case is an equitable doctrine which "expresses the practice of courts generally to refuse to reopen what has been decided."  *McCormick v. Brevig*, 2007 MT 195, ¶ 38, 338 Mont. 370, 169 P.3d 352 (citing *Scott v. Scott*, 283 Mont. 169, 175, 939 P.2d 998, 1001–02 (1997)).  While the law of the case doctrine is generally adopted by state and federal courts, there is a divergence in its application among different courts.  Namely, courts disagree on at what stage to apply the law of the case.  Some courts apply it after the district court has made a decision which is not appealed when opportunity to do so exists, while others apply it only after an appellate court has ruled on an issue and remands the case back to the lower court.  *Compare Aviall, Inc. v. Ryder Sys.*, 110 F.3d 892, 897 (2nd Cir. 1997) ("Under the doctrine of law of the case, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed,

becomes the law of the case for future stages of the same litigation . . . ." (internal quotations omitted)) *and Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 168 (3rd Cir. 1982) ("[J]udges of co-ordinate jurisdiction sitting in the same court and in the same case should not overrule the decisions of each other." (internal quotations omitted)) *with Prentis Family Found., Inc. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 52–53, 698 N.W.2d 900, 911 (2005) (explaining, in Michigan, the law of the case doctrine does not apply until a decision has been made by an appellate court and remanded; thus, the doctrine does not apply to decisions of a trial court) *and Fla. DOT v. Juliano*, 801 So. 2d 101, 107 (Fla. 2001) (clarifying, in Florida, the law of the case doctrine does not apply when a district court made a legal decision that went unchallenged on appeal when opportunity existed; rather, it only applies when a decision has been made by an appellate court and remanded).

¶23    Emmings' position is this Court's precedent follows the latter subset of courts, including the Court of Appeals of Michigan and the Supreme Court of Florida. Emmings is partially correct. We do follow the law of the case doctrine that when the Supreme Court decides a legal issue on appeal, that becomes "the law of the case and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal." *Masters Group Int'l., Inc. v. Comerica Bank*, 2021 MT 161, ¶ 27, 404 Mont. 434, 491 P.3d 675; *State v. Gilder*, 2001 MT 121, ¶ 12, 305 Mont. 362, 28 P.3d 488 (explaining a principle or rule of law established on appeal becomes the law of the case before the trial court and any subsequent appeal).

10

¶24 But applying the law of the case at the appellate level does not preclude also applying it at the district court coordinate jurisdiction level. This Court has long followed that application of the law of the case. As far back as 1976, in *State v. Carden*, we held:

> Although some courts limit application of the "law of the case" doctrine to final decisions of the highest appellate court . . . , we consider the better rule permits application of this principle to prior rulings of a trial court in the same case as well. . . . Under the "law of the case" principle, *judges of coordinate jurisdictions sitting in the same court and in the same case may not ordinarily overrule the decisions of each other*.

170 Mont. 437, 439–40, 555 P.2d 738, 739–40 (1976) (emphasis added). Likewise, as recently as 2021, we held:

> where rulings made at a stage in litigation that are not appealed from when the opportunity to do so exists, become "the law of the case for the future course of that litigation and the party that does not appeal is deemed to have waived the right to attack that decision at future points in the same litigation."

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Montana Twentieth Judicial Dist. Court*, 2021 MT 13, ¶ 11, 403 Mont. 57, 479 P.3d 946 (quoting *Norbeck v. Flathead County*, 2019 MT 84, ¶ 26, 395 Mont. 294, 438 P.3d 811 (quoting *McCormick*, ¶ 38)).

¶25 Here, Judge Larson and Judge Halligan are district court judges on the same court with coordinate jurisdiction. Judge Larson presided over the same case from which Judge Halligan recused herself and subsequently overruled an earlier decision on the case issued by Judge Halligan. Judge Halligan's order reimposing Emmings' probationary supervision, from which Emmings did not appeal, was the law of the case. Therefore, proper application of the law of the case requires determining whether Judge Larson abused the court's discretion in departing from Judge Halligan's previous order. *Carden*, 170 Mont. at 440, 555 P.2d at 740; *State v. Keefe*, 2022 MT 121, ¶ 13, 409 Mont. 86,

11

512 P.3d 741 ("[T]he law of the case doctrine is reviewed for an abuse of discretion."). A court abuses its discretion if it acts "based on a clearly erroneous finding of material fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *VanBuskirk v. Gehlen*, 2021 MT 87, ¶ 13, 404 Mont. 32, 484 P.3d 924.

¶26 A district court may deviate from the coordinate jurisdiction law of the case if the prior decision was a result of "a manifest error of fact or [was] otherwise manifestly incorrect." *Masters Grp. Int'l, Inc.*, ¶ 27; *see, e.g., Carden*, 170 Mont. at 440–41, 555 P.2d at 740 (explaining there were no factors sufficient to move Judge Wilson's discretion to reconsider the prior determination of Judge Allen, but there were factors weighing against the exercise of his discretion to reconsider the prior ruling). We recognize that is a high bar for a coordinate court to deviate from the prior court's established rulings on a case, as it should be. To hold otherwise would effectively extend appellate review powers to district court judges who assume a case from a coordinate member of the bench. "A disappointed litigant should not be given a second opportunity to litigate a matter that has been fully considered by a court of coordinate jurisdiction, absent unusual circumstances." *Hayman Cash Register Co.*, 669 F.2d at 169.

¶27 Given the foregoing, we hold Judge Larson's rulings on Judge Halligan's previous orders implicated the law of the case. As explained below when analyzing the remaining issues, we hold Judge Larson abused the court's discretion by striking Judge Halligan's order reimposing Emmings' probationary supervision because Judge Halligan's orders were not manifestly or clearly erroneous, and Judge Larson's rulings were "based on a

12

clearly erroneous finding of material fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *VanBuskirk,* ¶ 13.

¶28     *Issue Two: Did the District Court err in holding an individual on conditional discharge from supervision may terminate the remaining time on his sentence by moving out of state pursuant to § 46-23-1020, MCA?*

¶29     Emmings argues pursuant to § 46-23-1020(1)(b), MCA, that upon moving to California any time remaining on his sentence was completely discharged and he was not subject to revocation. The State disagrees, arguing the statute, when read as a whole, indicates Emmings' sentence was not terminated, but subject to revocation. We agree with the State. Emmings misinterprets the statute by failing to read the statute as a whole and ascribe meaning to all its operative terms.

¶30     "The starting point for interpreting a statute is the language of the statute itself." *State v. Christensen*, 2020 MT 237, ¶ 95, 401 Mont. 247, 472 P.3d 622. The "statutory language must be construed according to its plain meaning and, if the language is clear and unambiguous, no further interpretation is required." *Infinity Ins. Co. v. Dodson*, 2000 MT 287, ¶ 46, 302 Mont. 209, 14 P.3d 487 (citations omitted). In construing the language of the statute:

> the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.

Section 1-2-101, MCA. Specific terms are not to be isolated from the context in which the Legislature has placed them within the statute. *Mont. Sports Shooting Ass'n v. State*,

13

2008 MT 190, ¶ 11, 344 Mont. 1, 185 P.3d 1003.  "[T]his Court must also read and construe each statute as a whole so as to avoid an absurd result."  *Infinity Ins. Co.*, ¶ 46 (citations omitted).

¶31    If, however, the plain meaning of the statute is ambiguous, "the next step in judicial interpretation of the statute is to determine the intent of the legislature."  *Infinity Ins. Co.*, ¶ 46.  We determine the legislative intent by reading the statute's legislative history, "including the title of the original bill."  *Infinity Ins. Co.*, ¶ 46.  "Where the Legislature has not defined a statutory term, we consider the term to have its plain and ordinary meaning, and may consider dictionary definitions, prior case law, and the larger statutory scheme in which the term appears."  *Christensen*, ¶ 95 (citing *State v. Alpine Aviation, Inc.*, 2016 MT 283, ¶ 11, 385 Mont. 282, 384 P.3d 1035).

**Plain Meaning**

¶32    Section 46-23-1020(1)(b), MCA, states: "If an individual who has been granted a conditional discharge under 46-23-1011 or 46-23-1021 becomes a resident of another state, the conditional discharge must be construed as a discharge of the imposed sentence subject to revocation as provided in subsection (2)."  Emmings claims this section "has no meaning if it does not terminate a person's sentence."  In his brief, Emmings claims "[t]he statute says that the conditional discharge 'must be construed as a discharge of *the imposed sentence*' when a person becomes a resident of another state."  (Emphasis in original.)  He interprets the statute as if there were a period after the word "sentence."  Yet, he neglects to account for the statute's language clarifying that the discharge is "subject to revocation as provided in subsection (2)."  Section 46-23-1020(1)(b), MCA.  In doing so, Emmings

14

construes two portions of a single clause to be in conflict: (1) "the conditional discharge must be construed as a discharge of the imposed sentence" and (2) "subject to revocation as provided in subsection (2)." Then he argues only the former is operative while the latter is not.

¶33 The State points out the deficiency in this interpretation, explaining it misapplies "a fundamental canon of statutory interpretation by omitting language contained in the statute central to its determination." In turn, Emmings contends "[t]he State is doing the same. . . . [it] gives full weight to the latter portion of the sentence at issue, . . . but ignores the majority of the sentence." Thus, both parties complain the other violates the Surplusage Canon, which requires "*verba cum effectu sunt accipienda*" or "words must be understood with effect." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). Stated otherwise, every word of the statute must be construed as operative. Emmings' argument violates this canon.

¶34 If possible, we must interpret seemingly conflicting statutory language harmoniously. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."). This is accomplished if we read the clause *as a whole* and refrain from inferring invisible punctuation. "Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA. In doing so, it is evident the phrase "subject to revocation" modifies "discharge." There is no other word for the phrase "subject to revocation" to modify. Thus, when an individual on conditional discharge

15

becomes a resident of another state, the statute clarifies that his discharge remains conditionally subject to revocation under subsection (2). Section 46-23-1020, MCA. [2]

¶35 The State's interpretation is further bolstered by the distinction in regular statutory usage between the terms: "discharge" and "termination." "It is a settled rule of statutory construction that this Court interprets 'related statutes to harmonize and give effect to each. Different language is to be given different construction.'" *Bullock v. Fox*, 2019 MT 50, ¶ 59, 395 Mont. 35, 435 P.3d 1187 (quoting *Gregg v. Whitefish City Council*, 2004 MT 262, ¶ 38, 323 Mont. 109, 99 P.3d 151). Despite Emmings' claim the first part of § 46-23-1020(1)(b), MCA, "has no meaning if it does not *terminate* a person's sentence," the language of § 46-18-208(1), MCA, reveals a discharge of a sentence is distinct from a termination of a sentence because the statute references both terms separately. Section 46-18-208(1), MCA ("[One] may file a motion to terminate the time remaining on the sentence if: . . . the defendant has been granted a conditional discharge from supervision . . . and has demonstrated compliance with the conditional discharge for a minimum of 12 months."). "Discharge" and "termination" are not synonyms. They are routinely used to refer to different subjects. As such, a "discharge of the imposed sentence subject to revocation" is not the same as a termination of the sentence but is simply another way of stating "conditional discharge."

---

[2] We note Admin. R. M. 20.25.704(2) (2020) states, "During a conditional discharge [from supervision] the following apply: (c) if the parolee becomes a resident of another state, the parolee's sentence is discharged, but the parolee can be revoked as in [(6)]." (Rule mistakenly lists a nonexistent subsection (7)). This rule applies to parolees from prison, not persons on probation like Emmings. But the Rule is persuasive because it interprets the same statutory language at issue in this case. DOC has not promulgated an analogous Rule for probationers.

16

¶36    Moreover, § 46-18-208, MCA, precludes Judge Larson's interpretation of § 46-23-1020, MCA.    Section 46-23-1020, MCA, cannot be construed to terminate a defendant's remaining sentence if he moves out of state while on conditional discharge because § 46-18-208, MCA, already specifies a different procedure for terminating a sentence when a defendant is on conditional discharge.    First, it requires "the prosecutor, the defendant, or the defendant's attorney [to] file a motion to terminate the time remaining on the sentence."  Section 46-18-208, MCA.  Second, before such motion can be granted, the defendant must have served the lesser of either "3 years or two-thirds of the time suspended," and he must have been granted a conditional discharge from supervision and "demonstrated compliance with the conditional discharge for a minimum of 12 months."  Section 46-18-208(1)(b), MCA.

¶37    Emmings would have had to follow the above procedure to terminate the time remaining on his suspended sentence.    However, Emmings did not yet qualify for termination.  No motion to terminate the sentence was submitted; Emmings had not yet served either three years, or two-thirds of his time suspended; nor did Emmings demonstrate compliance with his conditional discharge for a period of 12 months. Emmings cannot simply bypass these requirements by moving out of state.  As such, we hold Judge Larson's interpretation of § 46-23-1020(1)(b), MCA, is incorrect.  It renders portions of the same statute meaningless where a harmonious interpretation is available, it misconstrues "discharge" as synonymous with "termination," and it creates an erroneous bypass to the explicit statutory procedure for terminating a suspended sentence.

17

¶38   For these reasons, we hold Judge Larson abused his discretion in deviating from the law of the case to strike Judge Halligan's order reimposing probationary supervision on Emmings.  Judge Halligan's order was not manifestly erroneous, and Judge Larson's order relied upon an erroneous legal conclusion and was not supported by evidence in the record.

¶39   *Issue Three: Did the District Court abuse its discretion when it held the previous judge banished Emmings from the State of Montana and imposed impossible conditions of supervision?*

¶40   The State argues that the District Court incorrectly concluded Judge Halligan banished Emmings from the State of Montana and imposed impossible conditions on his probation.  We agree with the State; it was an abuse of discretion to hold Judge Halligan banished Emmings from Montana.  While we agree Judge Halligan erred in allowing Emmings to reside in California while being supervised by Montana officers, we hold it was an abuse of discretion for Judge Larson to rule Emmings was subject to impossible supervision conditions because Emmings never proved an attempt to comply with supervision and Judge Halligan did not prohibit Emmings from returning to Montana to gain compliance.

**Banishment**

¶41   After conducting an evidentiary hearing, Judge Halligan revoked Emmings' conditional discharge and reimposed probationary supervision.  Given Emmings' established residence in California, Judge Halligan permitted Emmings to remain in California but required him to "make contact with the Probation office to determine what level of supervision they deem[ed] appropriate."  Judge Halligan reimposed all prior conditions of his probation "other than those that would directly require him to be in the

18

State of Montana." Judge Halligan's order reimposing probation specifically instructed "the State to work with Montana Probation and Parole to figure out the most appropriate way to supervise Emmings while he resides and remains in California." Moreover, the order specifically stated: "The Court will not entertain a solution that *requires* him to relocate to Montana." (Emphasis added.)

¶42 Judge Larson abused his discretion in interpreting this order, which permitted Emmings to remain in California, as a banishment from the entire state of Montana. Indeed, Judge Larson is correct this Court has prohibited banishment conditions when they are "not reasonably related to the goals of rehabilitation and [are] broader than necessary to protect the victim." *State v. Muhammad*, 2002 MT 47, ¶ 28, 309 Mont. 1, 43 P.3d 318. However, nothing in Judge Halligan's order reimposing probation supervision indicates Emmings was banished from Montana. Rather, the court's statements both during the evidentiary hearing and in the order reimposing probation clearly *permitted* Emmings to remain in California and *did not require* him to return to Montana. Judge Larson's order that Emmings was banished from Montana constitutes an abuse of discretion because it disregards the plain language of the court's order.

**Impossible Conditions of Probation**

¶43 Judge Larson also struck Judge Halligan's order reimposing probationary supervision because the conditions were "unquestionably illegal, contradictory, and made it impossible for Mr. Emmings to be able to stay in compliance with probation." Emmings argues he could not comply with supervision by Montana probation officers while living in California, and Judge Halligan erred by not requiring him to comply with the Interstate

19

Compact for Adult Offender Supervision (Interstate Compact), to be approved for probation in California. Emmings urges us to affirm Judge Larson's ruling that it was impossible to comply with the supervision order, and to strike the conditions of his supervision.

¶44 The State claims Emmings must first prove it is impossible to comply with the conditions. Then if any condition is deemed impossible, that condition—not the entirety of the conditions or the sentence—should be stricken. Finally, the State urges us to disregard Emmings' arguments on the Interstate Compact because they were not raised below and we should not consider new arguments on appeal. Even if we do consider it, the State argues no statute prohibits a Montana probation officer from supervising an offender outside Montana.

¶45 Initially, we agree with the State that Emmings is required to prove the impossibility of his compliance with conditions of supervision. If he proves any such condition is impossible, then we have repeatedly held that condition, not the entirety of the sentence, should be stricken. "[T]his Court has held that if a condition of a suspended sentence is impossible to complete, it is therefore illegal and should be struck from the defendant's sentence." *State v. Villalobos*, 2024 MT 301, ¶ 14, 419 Mont. 256, 560 P.3d 617 (citation omitted). One or even a few illegal conditions of a suspended sentence does not require the entire sentence to be overturned, especially if other conditions remain possible. *See e.g., State v. Cook*, 2012 MT 34, ¶ 36, 364 Mont. 161, 272 P.3d 50 (ordering a GPS monitoring condition to be struck from Cook's sentence because the monitoring service was unavailable and therefore impossible); *Muhammed*, ¶¶ 28–29 (striking the banishment

20

condition from the defendant's sentence because the condition was "not reasonably related to the goals of rehabilitation and is broader than necessary to protect the victim"); *Villalobos*, ¶ 14 ("[I]f it is impossible for the defendant to complete the treatment court— because he fails to qualify for admission—then the condition becomes impossible to fulfill and must be stricken from the sentence.").

¶46 Our holding in *Villalobos* requires the offender to first demonstrate an impossibility to comply with the condition, after a good faith attempt to do so. *Villalobos*, ¶ 14. We held a district court can order treatment court as a condition of a suspended sentence, but if the condition becomes impossible to fulfill due to lack of acceptance into the court, then it becomes an impossible condition to fulfill. *Villalobos*, ¶¶ 13–14. But merely claiming a condition is impossible is insufficient to carry this burden.

> The impossibility . . . however, must not be created by the defendant's own poor efforts. The defendant must make a good faith effort to apply and complete the pre-admission tasks and requirements imposed by the treatment court in a timely manner and refrain from commission of a disqualifying offense as determined by the treatment court committed after execution of a plea agreement or the imposition of the condition.

*Villalobos*, ¶ 14.

¶47 We agree with the State that the record does not include evidence of a good faith attempt by Emmings to comply with supervision. Lizotte attempted to contact Emmings in August, September, and October 2023. Emmings eventually responded with an email that began, "Yeah, I've decided that I'm not going to be put back on probation . . . ." When Lizotte later connected with Emmings by phone, he was met with an

21

expletive-laden tirade. These indicate a lack of effort to comply with conditions, no matter how possible or achievable they may be.

¶48 Further, Judge Larson's ruling came in response to briefs on the matter, not an evidentiary hearing that the conditions were in fact impossible to perform. The ruling preempted Emmings' burden to demonstrate a good faith effort and impossibility and precluded the State from responding to that evidence. The ruling that the probation conditions were impossible constitutes an abuse of discretion because it relieved Emmings of his burden to show good faith effort and impossibility and deprived the State of its opportunity to provide evidence in response.

¶49 Finally, the State urges us to ignore Emmings' arguments that it is impossible for Montana probation officers to supervise an offender outside Montana, on the grounds these are new arguments on appeal. While the specific claim that Montana probation officers cannot supervise outside of Montana is new, it is a logical extension of Emmings' argument raised below and is not wholly new:

> Probation was also put in the impossible task of supervising an individual they had no ability to actually supervise. [Emmings] was not able to follow the rules of the interstate compact and could not be transferred to California Probation, and because he wasn't allowed in the District, they had no way to verify his housing, employment, or financial status.

¶50 This argument is premised on the theory that Judge Halligan banished Emmings, and therefore he could not return to his assigned "District" (in Montana) to comply with probation or initiate supervision transfer to California via the Interstate Compact. While we explained above the error of the banishment theory, we agree with Emmings his

22

probation supervision must be either in Montana or transferred to another state via the Interstate Compact.

¶51 Under the Interstate Compact a convicted offender who wishes to transfer his or her residence from Montana to another state must apply for their supervision to be transferred to the probation supervision agency of the receiving state. Section 46-23-1115(2), art. I (1), MCA ("The states entering into this compact recognize that they are responsible for the supervision of offenders who are authorized pursuant to this compact to travel across state lines to and from the compacting states."). The Interstate Compact's purpose includes establishing a framework to regulate the interstate movement of convicted offenders, and to provide for "the effective tracking, supervision, and rehabilitation of offenders by the sending and receiving states." Section 46-23-1115(2), art. I(2), MCA.

¶52 Judge Halligan erred in suggesting, but not requiring, that Emmings comply with the Interstate Compact before establishing residence and supervision in California:

> [T]he Court shall permit Emmings to reside in California, where he has relocated, even if he is not approved for supervision pursuant to the provisions of the Interstate Compact for Adult Offender Supervision. If the State of California agrees to assist with supervision pursuant to the Interstate Compact, Emmings shall cooperate with the designated supervision conditions.

¶53 Emmings is correct; Montana probation officers supervise offenders in Montana. DOC fulfills its supervision duties by assigning Montana probation officers to districts within Montana, § 46-23-1004(1), MCA, and by administering the Interstate Compact for offenders departing to other states, § 46-23-1004(8), MCA. A Montana offender "does not have a right to live in another state" unless approved for transfer by the sending and

23

receiving states pursuant to the Interstate Compact. Then he or she must comply with supervision in the receiving state, or face revocation and return to the sending state. Section 46-23-1115(2), art. I(4), MCA.

¶54 Although Judge Halligan erred in not requiring Emmings to comply with Montana or Interstate Compact supervision, the error did not impose upon Emmings or the probation officers the "impossible task" he claims it did. His argument is based upon the claim he was banished from Montana and therefore could not return to either cooperate with Montana supervision or obtain approval to transfer to California. Since we held he was not banished, he could have returned to Montana and complied with the Court's supervision orders. And like his previous argument, Emmings has not demonstrated a good faith attempt to comply with this so-called impossible condition.

¶55 We hold the District Court abused its discretion by ruling the previous judge had imposed impossible supervision conditions on Emmings. The ruling was based upon an erroneous legal ruling that Emmings had been banished from Montana and was based upon a lack of evidence in the record that Emmings had made a good faith attempt and was unable to comply with transfer of supervision to California.

## CONCLUSION

¶56 The District Court abused its discretion in departing from the law of the case as ordered by the previous district judge. Emmings did not terminate the remainder of his suspended sentence by moving to another state while on conditional discharge from supervision. The District Court abused its discretion by holding the previous judge had

24

banished Emmings from Montana, and by holding the previous judge imposed impossible conditions of supervision upon Emmings.

¶57    We reverse the District Court and reinstate the previous order revoking Emmings' conditional discharge from supervision.  We remand to the Fourth Judicial District Court for consideration of the State's petition to revoke Emmings' suspended sentence consistent with this Opinion, before a different judge.

/S/ CORY J. SWANSON

We Concur:

/S/ KATHERINE M BIDEGARAY
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA